IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE GUARDIANSHIP & CONSERVATORSHIP OF BETTE O.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE GUARDIANSHIP & CONSERVATORSHIP OF BETTE O.,
AN INCAPACITATED AND PROTECTED PERSON.

PETER O., INTERESTED PARTY, APPELLANT,

V.

SHERRY L. WOODARD-RUSH, GUARDIAN & CONSERVATOR, APPELLEE.

Filed January 7, 2020.    No. A-19-022.

Appeal from the County Court for Douglas County: SHERYL L. LOHAUS, Judge. Affirmed.

Peter O., pro se.

Michael J. O'Bradovich, P.C., for appellee.

MOORE, Chief Judge, and BISHOP and WELCH, Judges.

BISHOP, Judge.

Peter O., pro se, appeals the decision of the county court for Douglas County denying his motion for visitation with his mother, Bette O., who is 87 years old and resides in a nursing home. We affirm.

## BACKGROUND

Peter is Bette's adult son. Bette has dementia and resides in a nursing home in Douglas County, Nebraska. Sherry L. Woodard-Rush is Bette's guardian.

Peter, pro se, initiated proceedings on August 13, 2018, when he sent an email to the county court judge claiming that a social worker was "grossly misrepresenting [his] behavior" toward Bette to Bette's guardian, which had an impact on his visitation with Bette. Peter requested "a

- 1 -

hearing so that we can get down to the truth of this matter and thus overcome any cognitive bias with the actual facts." The county court issued an order stating the matter would come before the court on August 31, but "[t]he hearing will not be an evidentiary hearing, but rather a status check."

At the status check hearing on August 31, 2018, the county court informed Peter that it was not sure what remedy he was asking for. Peter informed the court that he was getting "only one [visit] a week now," but wanted to be able to visit Bette three times a week. The court set an evidentiary hearing for October 3.

At the evidentiary hearing on October 3, 2018, both Peter and Woodard-Rush appeared pro se. Peter testified in his own behalf and called two witnesses. Woodard-Rush testified in her own behalf and also called witnesses. Additionally, exhibits were received into evidence. A summary of the relevant evidence follows.

According to Peter's testimony, Bette has been in her current nursing home since September 2017 and Peter was having supervised visits with Bette 3 days per week (supervised visits were implemented at her previous nursing home after there were allegations that Peter hit her). Woodard-Rush and two of Peter's friends each supervised one visit per week. Peter said there was a "vague allegation" of his "misbehavior" in October. Then in March 2018, it was reported that one of his supervising friends was napping, at which point his friends decided to "be extremely much more diligent in their supervising me." In June he received an email from Woodard-Rush stating there had been an allegation that his attention to Bette was inappropriate. Then on August 9 there was a "baseless" allegation that he kissed Bette on the lips; he testified that he had a cold that week and made sure not to kiss his mother at all. According to Peter, Woodard-Rush said that the nursing home requested that his friend no longer be allowed to monitor visits. Peter stated that now only Woodard-Rush supervises visits "[a]nd she only lets me have 30 minutes once a week"; he was previously getting almost 2 hours per week.

Peter's two friends who supervised his visits testified. One testified that even though he was there at visits, he was on his computer and "wasn't actively watching Pete[r] constantly." However, after the friend was informed of concerns (i.e., kissing and fondling) by Woodard-Rush, he tried to be more diligent and "actively monitored" Peter and Bette. Both of Peter's friends testified that they had not seen anything inappropriate between Peter and Bette.

Woodard-Rush testified that in 2015, she was Bette's friend and was asked by Adult Protective Services to become Bette's guardian because Peter was not an appropriate candidate; according to Woodard-Rush, Peter "was awaiting trial on numerous child pornography charges." Woodard-Rush testified that Peter had "been very difficult" to work with "because of his mental illnesses." She said that Peter "was found mentally incompetent . . . in . . . Sarpy County . . . to stand trial on . . . charges of child pornography. When he was arrested [in 2015], it was on television. He was televised saying that he was God and that made it okay for him to possess child pornography." A 2015 news article was received into evidence without objection. An order from the Sarpy County District Court was received into evidence over Peter's objection that his "case is sealed." (When the county court asked if he had documentation to support that, Peter responded, "Not with me.") The district court order from November 2016 referenced delusional and bipolar disorders, found Peter incompetent to stand trial, and indicated there was not a substantial probability he would become competent within the foreseeable future (the charges in the criminal

case were not specified in the order). Woodard-Rush believed that most of the difficulties with visits between Peter and Bette were because of Peter's "mental illness."

Woodard-Rush stated "problems [with Peter] have been going on since I became guardian," beginning when Bette was at a previous facility. While at the previous facility, Bette reported that Peter got angry with her in the car and hit her in the head with his fist, and then told her not to tell. (As a result, Peter's visits at the previous facility had to be supervised by Woodard-Rush.) When Bette moved to her current facility, "the rules came with her," and Peter could only visit if Woodard-Rush was there. Peter then found two people from his church that "seemed acceptable" to monitor his visits. But then "phone calls from the Social Work Department started reporting that nurses -- different nurses had witnessed inappropriate behavior until, finally, August [2018], they asked that those monitors no longer accompany him." Woodard-Rush stated she "negotiated with the nursing home to let [Peter] have one visit a week with [Woodard-Rush] as the monitor."

Woodard-Rush testified that she personally witnessed Peter being "overly affectionate" with Bette, specifically "the constant kissing all over her face" and "rubbing her body all over," including her breasts. (The date or dates on which Woodard-Rush witnessed this behavior was not specified.) Woodard-Rush said Peter was "rubbing [Bette's] chest, her back, her arms, anywhere [he] could reach while she was seated in a wheelchair." Peter was "kissing [Bette] and coddling her in a romantic fashion." Woodard-Rush had to tell Peter to stop. The county court asked if while Peter was rubbing Bette, he was kissing her all over the face at the same time, and Woodard-Rush responded, "Yes."

April Hauf is the Director of Social Services at the nursing home where Bette resides. Hauf had not personally witnessed any inappropriate interaction between Peter and Bette. However, she was allowed to testify about correspondence and nurses' notes from Bette's medical records; the notes and correspondence were received into evidence over Peter's objection that the exhibits were "untruthful." Hauf testified that nurses would leave her a voicemail or "it would be in our morning report" about the interaction between Peter and Bette, and then Hauf would relay the information to Woodard-Rush. Hauf agreed that in August 2018, the nursing home asked that Peter no longer have anyone else monitor his visits with Bette, and it was agreed that Woodard-Rush would be allowed to monitor one visit a week. According to Hauf, after the change in visitation, there were no reports of any mood changes in Bette, and Bette had remained stable and content.

On cross-examination, Hauf agreed that she told Peter she would not review a videotape from August 9, 2018, to verify whether the characterization of his behavior was accurate. (This is the date that Peter claimed there was a "baseless" allegation that he kissed Bette on the lips.) Hauf stated "there were other instances, other dates and times, that were in question" as well. And "due to the [multiple] complaints from the nursing staff about inappropriate behavior," the decision was made to only allow Woodard-Rush to monitor visits between Peter and Bette.

Heather Liefsen works at the nursing home where Bette resides; Liefsen does "minimum data set" coordination and is a nurse manager there. In May 2018, Liefsen witnessed Peter "rubbing his head on [Bette's] breast, just very close to her, giving her multiple kisses, and seemed to be -- I don't know the best way to say it, but excited." Liefsen stated that when Peter saw her, "he kind of sat back down a little bit, sat back, and there was more space." The person who was supposed to be supervising Peter and Bette had his laptop open and was not engaged in supervision.

Andrew Fisher is the executive director at the nursing home where Bette resides. Fisher testified that he had explained to Peter (date not specified) that the nursing home would continue to allow visits supervised by Woodard-Rush, but that if Peter's behavior continued, the nursing home would restrict his visitation.

Before concluding the hearing, the county court orally stated:

[T]he Court is going to deny increased visits. Based on the evidence that I heard today, I find that the evidence was clear and convincing that you [Peter] create problems to the point where supervised visits must continue through the guardian only, because that is what the home requires to keep [sic] [Bette] . . . to stay at the nursing home, and that's in her best interest.

The county court's written order filed on October 3, 2018, states that it "received clear and convincing evidence from the guardian Sherry [Woodard-]Rush that [Peter's] conduct during his visitation, which was previously supervised by two individuals of his choosing, as well as visits supervised by [Woodard-Rush], were inappropriate." Therefore, the court denied Peter's request for increased visitation with Bette.

On October 12, 2018, Peter filed a letter in which he asked the county court to reconsider its October 3 order based on (1) the "dissemination of evidentiary exhibits" in "violation" of statute and (2) the fact that he was not provided two exhibits in advance of the hearing. The county court set a hearing on what it called a "Motion for New Trial" for November 6.

On October 29, 2018, Woodard-Rush filed a letter "protesting" Peter's request for "a new trial" regarding visitation with Bette. In her letter, Woodard-Rush informed the county court, "I have, as of this date, banned him from [Bette's nursing home]. He may no longer visit."

On November 5, 2018, Peter filed a letter stating in part, "Within my request for a reconsideration of the October 3 . . . hearing . . . I do not want another trial. If hearts and minds are not changed by these words and the Holy Spirit's influence I will simply wait patiently until they are."

After a hearing on November 6, 2018, the county court entered a "Journal Entry and Order(s)," stating, "Hearing held on Letter regarding Motion for New Trial[.] Motion is denied." "The Court orders: Request for new trial is withdrawn by the interested party Peter O[.] IT IS SO ORDERED."

Also on November 6, 2018, Peter filed a letter asking the county court to "rule on [Woodard-Rush's] decision to permanently bar all visits with [Bette] made entirely on the basis of my decision to pursue legal due process." The county court set a hearing on what it called Peter's "Motion for Visitation"; the hearing was later held on December 10.

At the hearing on December 10, 2018, Peter and Woodard-Rush both appeared pro se. No testimony was given and no exhibits were received. The hearing was essentially a discussion between the parties and the county court. Woodard-Rush informed the court that Peter "continued to cause harassment and cause trouble for the nursing home, so the nursing home has decided that he can no longer visit." Woodard-Rush stated that she agreed that it was not in Bette's best interest to have Peter visit. Peter responded that was "factually incorrect," and that "[Woodard-Rush] told me, because I filed to reconsider the court case, I can never see my mom again." The court said it agreed that filing a motion for new trial should not be considered harassment. Woodard-Rush

responded that the nursing home made the decision not to allow visits. The court said, "If the nursing home denies you visitation and access . . . I have no power over them." Peter stated, "They're only denying me on the basis of [Woodard-Rush] denying me on the basis of me filing this case." The court responded, "No, that's not what the testimony was when we had the trial." "It sounds to me like [the nursing home has] decided that your visiting disrupts their business operations, including the care of your mother. That was the testimony I received." Peter acknowledged that he had withdrawn his motion for new trial. When Peter continued to argue that the nursing home was denying visitation because he was "proceeding with [his] legal right," Woodard-Rush stated, "the nursing home denied visitation because he was sexually molesting his mother." In both its oral pronouncement and its written order filed that same day, the court denied Peter's motion for visitation.

Peter now appeals the county court's order dated December 10, 2018.

## ASSIGNMENTS OF ERROR

Summarized, Peter assigns the county court (1) ignored "direct contradictions" and "major inconsistencies" in the guardian's testimony, (2) used an earlier hearing (at which he was denied "access to key evidence") as the basis for its decision, and (3) failed to act upon a subpoena.

## STANDARD OF REVIEW

An appellate court reviews guardianship and conservatorship proceedings for error appearing on the record in the county court. *In re Guardianship & Conservatorship of Alice H.*, 303 Neb. 235, 927 N.W.2d 787 (2019). When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Id*.

## ANALYSIS

Initially we note that in his notice of appeal, Peter specifically states he is appealing the county court's order filed on December 10, 2018, which denied his motion for visitation.

However, Peter's brief claims the county court made errors at the October 3, 2018, hearing. Any issues related to the October 3 hearing and subsequent order are not properly before us as they were not timely appealed. See, Neb. Rev. Stat. § 30-710 (Cum. Supp. 2018) (any order that is not intended as interlocutory or temporary under Neb. Rev. Stat. §§ 30-701 to 30-713 (Cum. Supp. 2018) regarding family visitation with resident of health care facility or home or other residential dwelling in which resident is receiving care and services shall be final, appealable order; such order may be appealed to Court of Appeals in same manner as appeal from district court directly to Court of Appeals); Neb. Rev. Stat. § 25-1912 (Cum. Supp. 2018) (notice of appeal must be filed within 30 days of final order made by district court).

As for his first assignment of error, Peter claims the county court ignored "direct contradictions" and "major inconsistencies" in the guardian's testimony. There was no testimony given at the hearing on December 10, 2018. The "contradictions" and "inconsistencies" noted by Peter come from his interpretation of the testimony and exhibits received at the October 3 hearing, as well as statements that were not evidence (e.g., documents filed on September 12--apparently for pretrial purposes prior to the October 3 hearing--that were not offered or received in any

- 5 -

proceeding). Peter's complaints about inconsistencies in the testimony are untimely and should have been raised in an appeal of the October 3 order.

In his second assignment of error, Peter alleges he was not allowed access to "key evidence" at the hearing on October 3, 2018. Brief for appellant at 12. Peter's claim that not having access to nurses' notes "crippled the effectiveness" of his rebuttal at the October 3 hearing is untimely as it should have been raised in an appeal of the October 3 order. In any event, the record reveals that Peter was allowed to review the complained of exhibits at the October 3 hearing--the county court stated, "[t]his is when you get to review [the exhibits] and offer any objections"--and Peter then objected to the exhibits because they were "untruthful."

In his third assignment of error, Peter complains about a "[s]ubpoena not acted on." Brief for appellant at 17. Our second Supplemental Transcript contains a "Praecipe for Subpoena" filed by Peter on September 17, 2018, which asked the clerk of the county court to "issue subpoena for service" on an "[u]named nurse referenced in an email from [Woodard-Rush] August 10" to appear and give testimony on Peter's behalf on September 18; the praecipe for subpoena stated that the witness should be directed to bring a "Video of Peter . . . @ second floor of [nursing home] TV room Thursday August 9." Peter argues "[t]he video tape of my behavior on August 9, 2018 would have established" the "malicious falsehood" against him. Brief for appellant at 17. As set forth in the background section of this opinion, at the October 3 hearing, Hauf agreed that she told Peter she would not review a videotape from August 9 to verify whether the characterization of his behavior was accurate (this is the date that Peter claimed there was a "baseless" allegation that he kissed Bette on the lips). Hauf stated "there were other instances [of inappropriate behavior], other dates and times, that were in question" as well. Again, the issue of any subpoena is untimely as it should have been raised in an appeal of the October 3 order. But in any event, the record is clear that Peter's visitation was not altered solely as a result of any incident that occurred on August 9.

The record before us contains competent evidence that Peter acted inappropriately with his mother, Bette. Therefore, we find no error on the record with respect to the county court's decision on December 10, 2018, to deny Peter's motion for visitation. The court's decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. See *In re Guardianship & Conservatorship of Alice H., supra*. See, also, § 30-703 (if family member petitioner is being denied visitation with resident of health care facility, family member may petition county court to compel visitation with resident; court may not issue order compelling visitation if court finds that visitation between family member and resident is not in best interests of resident); Neb. Rev. Stat. § 71-6021 (Reissue 2018) (administrator of nursing home may refuse access to nursing home to any person if presence of such person in nursing home would be injurious to health and safety of resident or would threaten security of property of resident or nursing home; any person refused access to nursing home may, within 30 days of such refusal, request hearing by department).

## CONCLUSION

For the reasons stated above, we affirm the county court's December 10, 2018, order denying Peter's motion for visitation with Bette.

AFFIRMED.